### In re ASBESTOS LITIGATION.

Superior Court of Delaware,
New Castle County.
April 4, 1986.

---

Thomas C. Crumplar, Esquire, Douglas B. Canfield, Mary Ann Matuszewski and Robert Jacobs, of Jacobs and Crumplar, Wilmington, for plaintiffs.

Jeffrey M. Austin, and Howard M. Berg, of Howard M. Berg & Associates, P.A., Wilmington for Nicolet.

POPPITI, Judge.

Defendant Nicolet, Inc. (hereinafter "Nicolet") filed a Motion for Summary Judgment in this case, claiming a lack of evidence showing product nexus or conspiracy. Summary judgment is granted with regard to product nexus, but denied as to conspiracy.

The appropriate standard for product nexus was set out by this Court in *Clark v. A.C. & S.*, Del.Super., C.A. No. 82C–DE–26, Poppiti, J. (Sept. 3, 1985). In order to withstand a motion for summary judgment, the plaintiff "must proffer evidence that at the time [the defendant's asbestos product] was present on the site he was in the area where [the product] was used, near that area, walked past that area, or was in a building adjacent to where [the product] was used if open windows or doors would allow asbestos fibers to be carried to the area where the plaintiff was working." *Clark*, at 4–5. In short, "a plaintiff must show ... that a particular defendant's asbestos-containing product was used at the job site and that the plaintiff was in proximity to that product at the time it was being used." *Odum v. Celotex Corp.*, 11th Cir., 764 F.2d 1486, 1488 (1985); *see Kee v.*

*Allied Chemical Corp.*, Del.Super., C.A. No. 80C–JA–14, Bifferato, J. (Feb. 6, 1986) [Available on WESTLAW, DE–CS database].

■ On a motion for summary judgment, facts and reasonable inferences are viewed in a light most favorable to the non-moving party. *Allstate Auto Leasing Co. v. Caldwell*, Del.Super., 394 A.2d 748, 752 (1978). The Court, however, will not indulge in speculation and conjecture; a motion for summary judgment is decided on the record presented and not on evidence potentially possible. *See Rochester v. Katalan*, Del.Supr., 320 A.2d 704, 708 n. 7 (1974); *Chrysler Corporation v. New Castle County*, Del.Super., 464 A.2d 75, 85 (1983). Thus the Court will not allow the plaintiffs to bring a defendant in based on a speculative exposure to a possible shipment of the defendant's product.

■ The defendant has supported its contention that there is no evidence of record showing any direct sales by Nicolet to the DuPont Newport plant where the plaintiffs worked, nor do any of the plaintiffs in this case recall ever having worked with Nicolet asbestos products. Likewise, while the evidence indicates that Nicolet had supplied raw asbestos fibers and asbestos products to other asbestos companies, the Court is satisfied that there is no evidence from which a person could reasonably infer that those fibers or products ever made their way to the Newport plant. To conclude otherwise would be mere speculation.

■ The testimony of Harold Silvious, a Newport worker, is that he worked with a "high temp" product but that he does not remember the name of the manufacturer. The plaintiffs have been unable to show any records documenting a shipment of Nicolet's high-temp product to Newport. The defendant notes that Nicolet was just one of several manufacturers of high temp, several of which were listed on DuPont's material specification sheets. Without more, a person cannot reasonably infer that the high temp Silvious worked with was a Nicolet product. To hold otherwise would be mere speculation and would be the establishment of something akin to market-share liability for makers of high temp, a change in Delaware tort law which if desired this Court believes is best left to the legislature. *Cf. Bateman v. Johns-Manville Sales Corp. (Keene Corp.)*, 5th Cir., 781 F.2d 1132, Jolly, J. (1986); *Blackston v. Shook & Fletcher Insulation Co.*, 11th Cir., 764 F.2d 1480, 1483–86 (1985).

Finally, the plaintiffs refer to the testimony of Louis Mancari, who stated at his August 16, 1983 deposition that he worked with Nicolet Kaytherm at the Newport plant. The evidence shows that the last shipment of Nicolet Kaytherm in Delaware was to Delaware Insulation in January of 1964 which, at the latest, would normally be shipped out in April or May of 1964. In February 1964, Nicolet stopped making Kaytherm. The earliest Mancari could possibly have seen Kaytherm at the Newport plant was when he began working there in March 1965, a full year after Nicolet stopped making the product. Mancari's testimony wavers from stating that Kaytherm was there "absolutely," Mancari Deposition at 95, to stating "if it was there I probably, I must have used it." Mancari Deposition at 117. Of the 38 workers at the Newport plant who have filed asbestos injury suits, including the six plaintiffs here, only Mancari claims to recognize the name "Nicolet" as one of the products they worked with. In addition, Mancari was not listed as a co-worker with the plaintiffs. The closest that Mancari can be placed to the plaintiffs is that Mancari used a washroom that he testifies was also used by two of the six plaintiffs, Earl Nutt and Horace Taylor. Mancari has no knowledge as to the other four plaintiffs. Further, no evidence has been produced to suggest that at the time Mancari allegedly used the Kaytherm he had been in proximity to the plaintiffs, either on the job or in the washroom. Without some evidence regarding proximity as to time and place no reasonable person could infer facts necessary to the nex-

us test. Without proximity being shown any inference would be merely speculative.

■ The defendant has produced evidence to indicate that the plaintiffs were not exposed to Nicolet products. The burden therefore shifts to the plaintiffs to demonstrate that a material issue of fact does exist. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680–81 (1979). By failing to produce evidence from which exposure to the defendant's product can reasonably be inferred, the plaintiffs have not demonstrated a dispute as to a material issue of fact.[1] Summary Judgment is therefore granted to the defendant with regard to plaintiffs' exposure to Nicolet products. I next turn to plaintiffs' conspiracy claim.

In reliance on their claim of an industry-wide conspiracy plaintiffs make a substantial effort in their answering brief to develop facts which they assert form the "linchpin" of their cause of action in this regard. I am satisfied, however, that a lengthy recitation of facts is not necessary to dispose of the instant application for summary judgment. I will, rather, focus on certain key facts in conjunction with the development of certain legal principles. In this regard, I am satisfied that the following basic alleged facts form the gravamen of plaintiffs' claim: First, Nicolet or its wholly owned Canadian subsidiary, Nicolet Mines, Ltd. (hereinafter "Nicolet Mines") was a member of the Quebec Asbestos Mining Association (hereinafter "QAMA") from 1948 until 1968 and a member of the Asbestos Textile Institute ("A.T.I.") in 1969, 1971 and 1972; and second, members of the referenced trade associations "suppress[ed] publication as well as general dissemination of medical and scientific data concerning the health hazards associated with inhalation of asbestos fibers."

■ Civil conspiracy does not exist as an independent cause of action in Delaware courts. It exists, it has been said, for only two purposes: first, to implicate others; second, to increase the measure of damages. *Phoenix Canada Oil Co. v. Texaco Inc.,* D.Del., 560 F.Supp. 1372, 1388 & n. 43 (1983). "The gravaman of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which would be actionable absent the conspiracy." *McLaughlin v. Copeland,* D.Del., 455 F.Supp. 749, 752 (1978), *aff'd* 3d Cir., 595 F.2d 1213 (1979).

"[I]n order to establish a civil conspiracy it is necessary to show the combination of two or more persons for an unlawful purpose, or a combination for the accomplish-

---

**1.** Some jurisdictions have noted the similarities between summary judgment and a directed verdict. *See Lauck v. Publix Market, Inc.,* Fla.App., 335 So.2d 589, 590 (1976) (a summary judgment is, in essence, a directed verdict); *Fry v. Bennett,* Hawaii Supr., 59 Haw. 279, 580 P.2d 844, 846 (1978) (summary judgment is analogous to directed verdict; both require showing no genuine issue of material fact); *Lipe v. Javelin Tire Co.,* Idaho Supr., 97 Idaho 805, 554 P.2d 1302,. 1303 (1976) (purpose of summary judgment is to eliminate groundless claims which would end in directed verdicts); *Benjamin v. Deffet Rentals, Inc.,* Ohio Supr., 66 Ohio St.2d 86, 419 N.E.2d 883, 885 (1981) (both summary judgment and directed verdict are rendered only when, after construing evidence in favor of non-movant, reasonable minds can come to but one conclusion). *But see Fricke v. Hart,* Neb.Supr., 206 Neb. 590, 294 N.W.2d 737, 739 (1980) (summary judgment "is not a substitute for" directed verdict); *Aetna Casualty & Surety Co. v. Federal Ins. Co.,* W.Va.Supr., 148 W.Va. 160, 133 S.E.2d 770, 778 (1963) (even when trial judge is of opinion he should direct a verdict, he should hear evidence at trial and then direct rather than try case in advance on a summary judgment motion). I am not aware of any Delaware case which draws the connection between these two motions. I am content to note the similarities. In considering motions for both summary judgment and directed verdict, the evidence is viewed in the light most favorable to the non-movant. *Delmarva Power & Light Co. v. Stout,* Del.Supr., 380 A.2d 1365, 1368 (1977) (directed verdict); *Allstate Auto Leasing Co.,* 394 A.2d at 752 (summary judgment). Both motions require the trial court to determine whether on any reasonable view of the evidence, a jury could find in favor of the non-movant and against the movant. *Eustice v. Rupert,* Del. Supr., 460 A.2d 507, 509 (1983) (directed verdict); *Hercules Powder Co. v. DiSabatino,* Del. Supr., 188 A.2d 529 535 (1963) (summary judgment). Thus it would seem that a motion for summary judgment and one for a directed verdict would involve much the same considerations.

ment of a lawful purpose by unlawful means. In addition, while the essence of the crime of conspiracy is the agreement, the essence of a civil conspiracy is damages. In other words, absent damages, there is no cause of action for a civil conspiracy." *Weinberger v. UOP, Inc.,* Del. Ch., 426 A.2d 1333 (1981), *rev'd on other grounds,* Del.Supr., 457 A.2d 701 (1983).

In *Farrall v. Armstrong Cork Co.,* Del. Super., 457 A.2d 763 (1983), it was stated that in the absence of direct evidence that the plaintiff was exposed to the asbestos product of a particular defendant, any general conspiratorial claim against that defendant lacks the necessary causal connection for tort contribution. *Farrall,* 457 A.2d at 770. To the extent this suggests that a defendant can only be liable in conspiracy when his own product causes the damage, it is in error. "It is a fundamental principle of our jurisprudence that co-conspirators are jointly and severally liable for the acts of their confederates committed in furtherance of the conspiracy." *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168, 170 (1976). Thus a person who conspires with a fiduciary to breach the fiduciary duty of trust is liable to the beneficiaries of the trust even though he himself had no fiduciary duty to those beneficiaries. *Tuckman,* 372 A.2d at 170; *Gilbert v. El Paso Co.,* Del. Ch., 490 A.2d 1050, 1057 (1984). This is how civil conspiracy fulfills its purpose to "implicate others."

■ In the present case, then, the defendant would be liable to the plaintiffs for injuries caused by exposure to another party's asbestos if it is shown that the defendant and that other party conspired to suppress information about the dangers of asbestos and that, as a result of and in furtherance of that conspiracy, that other party supplied asbestos without proper and adequate warning to the plaintiffs' work-

place, where the plaintiffs sustained injuries due to that exposure.

■ It is undisputed that Nicolet Mines was a member of QAMA from 1948 until 1968. It is also undisputed that during this period of time, Nicolet Mines was a wholly owned subsidary of Nicolet. Nicolet asserts that neither it nor any of its corporate predecessors was a member of QAMA, and that it is not responsible for the acts of its independent subsidiary, Nicolet Mines. This assertion by Nicolet must be viewed against the backdrop of testimony by Guy Gabrielson, Jr., President of Nicolet, Inc. from 1957 to 1980 that "[i]n 1964, I know that Nicolet was a member of the Quebec Asbestos Mining Association." Further, evidence is undisputed that Gabrielson was present at a March 1968 special meeting of QAMA at which considerable time was spent in discussion of the hazards of asbestos and the delay in the development of safe practices for using asbestos. I need not decide, however, that Nicolet itself was a member of QAMA in order to dispose of the Motion for Summary Judgment. Just as mere membership in a trade association, including attendance at meetings, is not sufficient to give rise to an inference of conspiracy, absent proof of "knowing participation" in the wrongful conduct, *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 920, 102 S.Ct. 3409, 3429, 73 L.Ed.2d 1215 (1982); *James Julian, Inc. v. Raytheon Co.,* D.Del., 557 F.Supp. 1058, 1064–65 (1983), so too, proof of non-membership alone does not preclude the possibility of Nicolet's participation in its own conspiracy with the members of the association.[2]

It is clear that Nicolet does not dispute the fact that the members of QAMA and the members of the Asbestos Textile Institute intentionally suppressed information on the dangers of working with asbestos from the 1930s up to and including the

---

**2.** By "members of the association" I am not suggesting that Nicolet could conspire with its wholly owned subsidiary, Nicolet Mines. It has been held that a parent corporation cannot conspire with such a subsidiary. *See Copperweld*

*Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2740–42, 81 L.Ed.2d 628 (1984); *John Peterson Motors, Inc. v. General Motors Corp.,* D.Minn., 613 F.Supp. 887 (1985).

1970s. Nor does Nicolet dispute that the plaintiffs were exposed to the asbestos of other companies who were members of QAMA or A.T.I. Instead, Nicolet denies that it was a member of QAMA or that it knowingly took part in this conspiracy.

 "Knowing participation" in a conspiracy, however, need not be an express agreement; tacit ratification is sufficient. *De Jong Packing Co. v. United States Dept. of Agriculture*, 9th Cir., 618 F.2d 1329, 1334, *cert. denied* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *James Julian, Inc.*, 557 F.Supp. at 1065. The District Court for Delaware has stated that even membership and knowledge of the association's wrongful conduct is not, by itself, sufficient to show "knowing participation," but once that is coupled with a consistent later act, an inference of knowing participation is permissible. *James Julian, Inc.*, 557 F.Supp. at 1065 n. 18. Likewise, consciously parallel action is not sufficient to show conspiracy, but it is enough that knowing concerted action was contemplated or invited, the defendant adhered to the scheme and participated in it. *De Jong Packing Co.*, 618 F.2d at 1334 (quoting *Interstate Circuit Co. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939)).

There is at least some evidence that Nicolet had direct contact with members of QAMA, which members subsequent to the March 1968 meeting publically minimized the dangers of asbestos. In this respect, I note in particular one transaction with the Navy.

In May of 1969, Nicolet along with other members of A.T.I. received a letter from the U.S. Department of the Navy posing a number of very specific questions regarding asbestos, its hazards and whether adequate substitution of materials existed for Navy purposes. In particular the Navy advised substantially as follows:

"The Philadelphia Division of the Naval Ship Engineering Center has been assigned tasks to conduct a survey of suppliers of insulation to the Navy, to secure technical data literature, and to investigate medical research findings, safety manuals, and data on research being pursued by private industry intended to develop new or improved materials which may be suitable for replacements for asbestos for piping, felts and lagging. The cooperation and support of industry for this study is earnestly solicited by this activity since the health of the worker is the concern of management, labor and the government."

Shortly after receipt of this correspondence M.Q. Scowcroft of Raybestos-Manhattan sent correspondence dated May 28, 1969 to Johns-Manville copying members of the Board of Governors of A.T.I. It should be noted that Nicolet was not shown as receiving a copy of the May 28, 1969 correspondence. The letter stated *inter alia* as follows:

"We believe that some form of action should be taken by the Institute in the form of a protest at the earliest opportunity.

· · · · ·

"We feel it expedient to submit a letter prior to June 15th in order to contribute to discouraging a development program on substitutes for asbestos in shipboard insulation."

On May 26, 1969 Guy Gabrielson on behalf of Nicolet responded to the Navy's inquiry by stating *inter alia* as follows:

"Considerable research is now being conducted on the biological effects of asbestos fiber.

· · · · ·

But more importantly, the results of the research which currently is being reported leaves in substantial doubt, the question of whether or not and to what degree, asbestos fibers may be harmful to health.

· · · · ·

If asbestos fibers are harmful to health, we do not yet know why, nor do we know under what circumstances as-

bestos may cause undesirable effects or even whether asbestos used alone can cause any harm to human tissues.

. . . . .

Your letter appears to exclude entirely the possibility of using new asbestos materials in insulation applications."

Measured against the backdrop of what plaintiffs' expert Barry I. Castleman says was the "State of the Art" regarding asbestos, its dangers and methods of safe handling in May of 1969,[3] language of "substantial doubt," "if asbestos fibers are harmful to health" and lack of knowledge as to "under what circumstances asbestos may cause undesirable effects or even whether asbestos used alone can cause any harm to human tissues" and the fact that QAMA members were publicly minimizing the dangers may be viewed as some evidence from which a jury could reasonably conclude the existence of the alleged conspiracy to supress information regarding asbestos and its harmful effects.[4]

██ On a motion for summary judgment, facts and reasonable inferences are to be viewed in the light most favorable to the nonmovant. *See Allstate Auto Leasing Co. v. Caldwell,* Del.Super., 394 A.2d 748, 752 (1978). A jury may well find based on the evidence above that Nicolet both knew of the alleged harmful acts of QAMA and knowingly participated in the QAMA conspiracy. *Cf. Claiborne Hardware Co.,* 458 U.S. at 927, 102 S.Ct. at 3433 (while defendant's speeches were not proof of conspiracy themselves, they could be taken as evidence he gave other specific instructions to carry out violent acts or threats). For this reason, summary judgment will be denied as to conspiracy.

For the reasons set forth in this opinion, summary judgment is granted to the defendant as to the plaintiffs' product nexus

---

**3.** For a detailed discussion, regarding State of the Art, I am mindful of plaintiffs' expert's publication, B. Castleman, Asbestos: Medical and Legal Aspects (1984). The following excerpts are in my view noteworthy:

> In summary, asbestosi ; was by 1935 widely recognized as a mortal threat affecting a large fraction of those who had regularly worked with the material.
>
> . . . . .
>
> The carcinogenicity of asbestos was widely recognized by Nordmann, Hornig, and Koelsch in Germany in 1938. . . .
> The unpublished records cited in this accounting show U.S. asbestos industry officials to have been concerned about cancer and aware of medical reports by 1943. Some of the more startling data were actually published by the medical officer of Cape Asbestos, Hubert Wyers, in 1949. Dr. Hueper was meanwhile being quoted in popular writings, and this along with his scientific reports were matters of great concern to members of the U.S. asbestos industry by the mid-1950s.

Castleman, *supra* at 31, 102–03.

**4.** Counsel for Nicolet asserts that Mr. Gabrielson did not say or do anything which would form the basis of an inference that he and therefore Nicolet knowingly participated in the wrongful conduct. In this regard, Nicolet asserts among other things that studies from England in the 1930s were unknown to Mr. Gabriel-

son that early studies in the U.S. were either unknown to Gabrielson, or were not scientifically conclusive because the statistical base was too narrow, that although Gabrielson was aware of asbestos dangers in the mines he was not aware of asbestos dangers to other workers using products of asbestos, and that Gabrielson's actions with respect to his efforts to make his own mines more safe were consistent with his knowledge regarding asbestos dangers in the mines. However, I must be mindful of Gabrielson's testimony that "Dr. Selikoff's paper in 1964 certainly led me to question my belief that low levels of exposure were safe. As I said earlier, I remained skeptical for some time, but I since have concluded that lower levels of exposure, particularly to amphibole fibers, are more severe in their consequences than I had thought prior to the New York Academy of Sciences meeting in '64." I must also be mindful of the thorough analysis made in the "State of the Art" inquiry done by Mr. Castleman and must therefore conclude that indeed a reasonable jury could conclude as Castleman did that the level of knowledge and awareness by the membership of which the asbestos industry was a part was at a higher level than members of the industry would like one to believe. A reasonable jury could conclude, therefore, that members of the industry of which Gabrielson and Nicolet are a part took part in a conspiracy to minimize public access to that information, thereby minimizing the public's knowledge regarding the hazards of asbestos.

complaint, but denied with respect to conspiracy.

IT IS SO ORDERED.