Earl R. NUTT, et al.

v.

A.C. & S. CO., INC., et al.

Superior Court of Delaware,
New Castle County.

Submitted: April 24, 1986.
Decided: June 5, 1986.

Thomas C. Crumplar, Mary Ann Matuszewski, and Douglas B. Canfield of Jacobs and Crumplar, P.A., Wilmington, for plaintiffs.

Jeffrey S. Marlin of Tybout, Redfearn, Casarino and Pell, Wilmington, for defendants.

POPPITI, Judge.

This is a decision on the Motion for Summary Judgment filed by Southern Textile Corporation, formerly known as Southern Asbestos, a wholly owned subsidiary of H.K. Porter Company, Inc. (hereinafter "Southern"). The plaintiffs assert causes of action based on the alleged exposure of Oscar Hardy, George Ward and Edward Perkins to Southern's asbestos containing products and the alleged conspiracy between Southern and other members of the asbestos industry. These contentions will be examined in turn.

■ The requisite showing of product nexus has been spelled out in previous opinions during this litigation. To survive a motion for summary judgment, the plaintiff must proffer some evidence that not only was a particular defendant's asbestos containing product present at the job site, but also that the plaintiff was in proximity to that product at the time it was being used. *In Re: Asbestos Litigation*, Del.Super., 509 A.2d 1116 (1986); *Clark v. A.C. & S.*, Del.Super., C.A. No. 82C–DE–26, Poppiti, J. (Sept. 3, 1985).

The burden on summary judgment rests with the moving party. All facts and reasonable inferences must be considered in a light most favorable to the non-moving party. *Mechell v. Palmer*, Del.Supr., 343 A.2d 620, 621 (1975); *Allstate Auto Leasing Co. v. Caldwell*, Del.Super., 394 A.2d 748, 752 (1978). Examining the record in this light, I am satisfied that the facts are as follows:

The plaintiffs and/or their co-workers have asserted that they worked with asbestos textile products such as asbestos cloth, tape and rope at the duPont Newport plant. While Southern claims that asbestos cloth was not dusty and hence no asbestos fibers came from it, there is testimony from some workers at the Newport plant that all of these asbestos textile products were dusty. In general, the testimony evidences use of asbestos cloth and tape in the 1950s and 1960s. Neither the plaintiffs nor the co-workers identify the name "Southern Asbestos" or "Southern Textile." The plaintiffs note that products such as asbestos cloth did not carry labels or brand names. Thus, because the manufacturer's name was not on the products, the plaintiffs and co-workers could not be expected to remember it.

Delaware Insulation apparently was a major supplier of asbestos products to the various duPont plants. Gregory Stagliano, President of Delaware Insulation, while his deposition testimony was occasionally contradictory, did state at his June 3, 1985 deposition that Southern was a major source of asbestos cloth from the mid–1950s to the mid–1960s. He also testified that another major supplier was Amatex, and further represented that they occasionally used a little of Raybestos-Manhattan's product.*

Delaware Insulation's cash disbursement journals indicate that, of Southern, Amatex, and Raybestos-Manhattan, between May 1953 and October 1957 purchases were only being made from Southern. Both before and after that time period, several purchases were made of Amatex materials. The plaintiffs suggest from this that any asbestos textile products shipped from Delaware Insulation during this time period must be Southern's products. Stagliano stated at his June 6, 1985 deposition that almost all of their asbestos cloth stock went to duPont sites.

■ Of the three plaintiffs, two were clearly working with asbestos textile products during the May 1953 to October 1957 time period. Edward Perkins worked as a janitor in the Ti-Pure labs from August

---

* The plaintiffs claim that in 1958 Southern sold some asbestos products to Amatex, and suggest that some of Southern's product may have come to the Newport plant under the Amatex banner. There is, however, no tracing of Southern's products once they went to Amatex. Without more, this Court considers it mere speculation that Southern's products went to Newport through Amatex. *See In Re: Asbestos Litigation*, Del.Super., 509 A.2d 1116 (1986).

1956 to August 1973. Co-workers testified that asbestos cloth and tape was used in the labs. Oscar Hardy testifies that he worked in the silicon area from approximately 1956 to 1958. Co-workers state that asbestos tape was used extensively in this area. At this summary judgment stage, absent the defendant showing otherwise, I must conclude that this tape came from Delaware Insulation. *See Mechell v. Palmer*, Del.Supr., 343 A.2d 620, 621 (1975).

■ The situation is, however, different as to George Ward. Joseph Ellsworth states that he recalls using asbestos rope in Ward's area from 1951 to 1954. Delaware Insulation's cost disbursement journal, while showing no purchases of Amatex material from May 1953 to October 1957, evidences no purchases from Southern until mid–1954. On the state of this record I am satisfied that Ellsworth's evidence fails to support a reasonable inference that the rope used was Southern's. The only other evidence supplied to connect Ward with Southern's product comes from an affidavit of Harold Silvious. He stated that he used "large quantities" of asbestos cloth and tape from 1953 to 1957, and was a co-worker of Ward. This affidavit was, however, made after defendant's opening brief had been filed and while plaintiffs' answering brief was being prepared. At his deposition taken earlier, Silvious stated that he had not frequently used such asbestos cloth. Similarly, when listing the names of co-workers at his deposition, he did not mention Ward. It has been held that when a witness has previously given clear answers to unambiguous questions at deposition which negates the existence of a genuine issue of fact, that person can not create such an issue with an affidavit contradicting his earlier testimony, absent an adequate explanation. Such an affidavit is considered as creating sham issues. *See Van T. Junkins & Assocs., Inc. v. U.S. Industries, Inc.*, 11th Cir., 736 F.2d 656, 657 (1984); *Camfield Tires, Inc. v. Miche-lin Tire Corp.*, 8th Cir., 719 F.2d 1361, 1365 (1983). This Court does not take this step lightly, however, taking into consideration the time the affidavit was made and the conflict it creates with Silvious' prior testimony, this Court considers the affidavit as just creating sham issues. To allow such a tardy affidavit without explanation to be effective would make a summary judgment motion a meaningless gesture. Thus, I conclude that there is no credible evidence to support Ward's exposure to asbestos textile products during the relevant time period.

The strongest product nexus contention for the two remaining plaintiffs is as follows: Between May 1953 and October 1957 Delaware Insulation stocked only Southern's asbestos textile products. Virtually all of the cloth went to duPont sites. The plaintiffs or their co-workers at duPont's Newport site worked with asbestos cloth and tape. Thus, it is claimed that they must have worked with Southern's asbestos cloth and tape at least during this time period.

This argument has a sort of logical charm about it. There are two other facts, however, which Southern asserts to defeat it. First, Delaware Insulation has no records showing shipments of asbestos cloth or tape specifically to the Newport plant. The best evidence that has been submitted is that Delaware Insulation supplied duPont plants in general. Second, while it was a major supplier to duPont, Delaware Insulation was not the sole supplier. The burden at the summary judgment stage, however, is on the defendant. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979). Absent evidence showing that during the May 1953 to October 1957 time period the duPont Newport plant in fact bought asbestos cloth and tape from another manufacturer, the plaintiffs have enough to support the reasonable inference that at least during that time period the plaintiffs were exposed to Southern's prod-

ucts.** This ruling is based strictly on the facts developed in this record. Were there any evidence of record that another manufacturer was in fact supplying asbestos cloth or tape during this time period, absent product identification there would be insufficient product nexus under the law of this jurisdiction.

■ The plaintiffs argue that because identification of the manufacturer's product by the workers is a virtual impossibility due to the lack of labeling on the products, the burden of product identification should shift to the defendant. In short, they argue that the defendant should show that its products were not present. I wish to make it clear that this Court is not adopting that position.

This argument effectively seeks the implementation of some form of either alternative liability or market-share liability. This Court has previously declined accepting market-share liability as part of Delaware tort law. *See In Re: Asbestos Litigation*, Del.Super., 509 A.2d 1116 (1986). Likewise, this Court declines to adopt the alternative liability theory in Delaware. I am satisfied that such a change in traditional tort law should be left to the legislature. *Cf. Starling v. Seaboard Coast Line R.R. Co.*, S.D.Ga., 533 F.Supp. 183, 186 (1982) ("Deferring evaluation of the competing public policy considerations to the legislature would be consistent with an existing policy of judicial restraint in the products liability area.")

For the reasons stated above, therefore, summary judgment is denied with regard to product nexus as to plaintiffs Perkins and Hardy, but granted as to plaintiff Ward. This brings us to plaintiffs' conspiracy claim.

## II

■ Civil conspiracy requires the combination of two or more persons for an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, which conspiracy results in damages. *Weinberger v. UOP, Inc.*, Del.Ch., 426 A.2d 1333, 1348 (1981), *rev'd on other grounds*, Del.Supr., 457 A.2d 701 (1983). Civil conspiracy is not an independent cause of action in Delaware, but requires an underlying wrong which would be actionable absent the conspiracy. *See Phoenix Canada Oil Co. v. Texaco, Inc.*, D.Del., 560 F.Supp. 1372, 1388 (1983); *McLaughlin v. Copeland*, D.Del., 455 F.Supp. 749, 752 (1978), *aff'd*, 3d Cir., 595 F.2d 1213 (1979). Southern argues that this requirement of underlying wrong means that "the plaintiff must show some independent cause of action against that manufacturer whose products were not at the job site," Defendant's Reply Brief at 39, relying on *Farrall v. Armstrong Cork Co.*, Del.Super., 457 A.2d 763 (1983). The suggestion seems to be that there must be an underlying cause of action against each separate individual in the conspiracy, rather than just one cause of action underlying the whole conspiracy. This Court is satisfied that Southern's characterization of civil conspiracy law is incorrect. *See In Re: Asbestos Litigation*, Del. Super., 509 A.2d 1116 (1986). If five people conspire to commit a tort, and only one of them actually commits the tort, with a conspiracy count a plaintiff can bring in all five. *Nobriga v. Johns-Manville Sales Corp.*, Hawaii Circ. Ct., C.A. No. 55624, Won Bae Chang, J. (March 11, 1982). An example of the use of civil conspiracy in a suit is the corporate takeover case of *Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050 (1984). The plaintiff shareholders of El Paso charged that defendant Burlington had conspired with the El Paso board of directors for the board to breach the fiduci-

---

** Southern asserts a *de minimis* argument that even if plaintiffs were exposed to their product, the harm caused would be so minimal that they should not be held liable. Plaintiffs' expert, Doctor Susan M. Daum, indicates that exposures to asbestos are cumulative, and thus any exposure is harmful. The jury must decide the ex-

tent of the harm. *See Baylis v. Wilmington Medical Center*, Del.Super., C.A. No. 871, 1975, Walsh, J. (May 12, 1983) at 12 (two errors of care were minor, but to the extent they resulted in discomfort, they present issues of fact for jury determination).

ary duty it owed to the shareholders. Then Vice Chancellor, now Justice, Walsh found that, even though Burlington owed no fiduciary duty to the plaintiffs, "if El Paso's board breached its fiduciary duty to its shareholders, with Burlington's knowing participation, and damages are shown, then the plaintiffs can prevail." *Gilbert v. El Paso Co.*, 490 A.2d at 1058.

■ With regard to asbestos litigation then I am satisfied that a conspiracy claim is stated if it is alleged that an asbestos company agreed with other asbestos companies to suppress knowledge of the dangers of asbestos; and pursuant to this conspiracy the companies intentionally marketed their asbestos products without effective warnings; and that the plaintiffs were injured by such products of at least one of the conspirators. Lack of an effective warning may make a product defective. *In Re: Asbestos Litigation*, Del.Super., C.A. No. 81C–FE–27, et al., Poppiti, J. (March 21, 1986) at 4 [Available on WESTLAW, DE–CS database]; *Wilhelm v. Globe Solvent Co.*, Del.Super., 373 A.2d 218, 223 (1977), *aff'd in part, rev'd in part*, Del. Supr., 411 A.2d 611 (1979). Thus the underlying wrong of this alleged conspiracy could be characterized as the intentional marketing of a defective product.

Having so stated the general legal framework, I now turn to the evidence to determine whether there is evidence from which a reasonable jury could find that Southern was part of such a conspiracy. Reviewing the massive appendices filed with this motion, I am satisfied that there is sufficient evidence to support such a finding.

The first evidence relates to communications involving Raybestos-Manhattan, Inc. ("Raybestos") and Johns-Manville Corporation ("J–M"). While these communications do not involve Southern, they evidence a foundation for the alleged conspiracy. First is a letter dated September 25, 1935 from A.S. Rossiter of *Asbestos Magazine* to Sumner Simpson, President of Raybestos. Rossiter was interested in printing articles on asbestosis, but notes that "[a]lways you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected." Plaintiffs' Appendix at CCC–1. Next is a letter dated October 3, 1935 from Vandiver Brown, attorney for J–M, to Simpson, in which he states: "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity." Plaintiffs' Appendix at EEE–1. Finally, in a letter dated March 23, 1939, Rossiter of *Asbestos Magazine* stated to Simpson: "The information you give as to your Saranac investigation is most interesting. Of course we understand that all this information on asbestosis is to be kept confidential and that nothing should be published about asbestosis in 'ASBESTOS' at present." Plaintiffs' Appendix, at FFF–1.

The reference to the Saranac investigation is to a study sponsored by various members of the asbestos industry, including Southern. In a November 1936 letter from Simpson to the President of Thermoid Rubber Co., Simpson indicated that the Saranac Lake research would give asbestos companies something to "go into court" with, to state specifically that asbestos would not cause certain diseases. He goes on to state:

> The idea of Mr. [Vandiver] Brown and myself would be to have four or five (or even more if we could get them) Asbestos manufacturers take over this study by subscribing an equal amount per year, for three years, and then we could determine from time to time after the findings are made, whether we wish any publication or not. My own idea is that it would be a good thing to distribute the information among the medical fraternity, *providing it is of the right type and would not injure our companies.*

Plaintiffs' Appendix at VVV–2 (emphasis added). When the Saranac Lake agreement was entered into by the asbestos companies, including Southern, it was agreed that they would determine whether, to

what extent and in what manner the results would be make public.

The focus now shifts to proceedings involving the Asbestos Textile Institute ("ATI") of which Raybestos, J–M and Southern were members. The minutes of a March 7, 1957 meeting of ATI's Air Hygiene Committee, of which Southern's J.L. Mitchell was a part, reflect that, by a majority vote, the committee decided to discontinue the study of the asbestos-cancer link. There were three stated reasons for this decision. First, the Quebec Asbestos Mining Association was conducting a similar program, the results of which would be made available to ATI. Second, there was "a feeling among certain members that such an investigation would stir up a hornet's nest and put the whole industry under suspicion." Third, they did not "believe there is enough evidence of cancer or asbestosis, or cancer and asbestosis, in this industry to warrant this survey." Plaintiffs' Appendix at WWW–1. Plaintiffs focus on the second reason as indicating an intent to keep the public from learning of the dangers of asbestos. While this Court realizes that an argument could be made that this document evidences nothing more than the members' belief that there was no link between asbestos and cancer and that they did not wish to waste money on what they believed to be a useless study, I am satisfied that this is argument for trial. It is for the jury to determine what meaning this document has.

The next evidence of conspiracy relates to ATI's reaction to Dr. Irving J. Selikoff's findings on the dangers of asbestos. A lawyer for ATI sent a letter to J.T. Griffis of H.K. Porter Company, Inc., of which Southern is a wholly owned subsidiary, informing him of a letter sent by ATI to Dr. Selikoff. The letter is phrased in terms of urging caution, and expressing worry over misrepresentations, oversimplifications and exaggerations. The letter also claims that the asbestos industry encourages responsible research. Plaintiffs' Appendix at YYY–1 to –5. Plaintiffs suggest that this was a veiled threat of legal action against Selikoff in an attempt to silence him.

Shortly after this, Griffis received a letter from John A. Brown, President of ATI, informing him that three news releases on the biological effects of asbestos had been suppressed "due to the alertness of Mr. Edward Schuman of J/M and Mr. Robert Cryor of North American Asbestos Company." Plaintiffs' Appendix at BBBB–1.

Finally, at a February 1971 ATI meeting which was chaired by H.K. Porter's L.E. Moody, Raybestos' J.L. Goodman, "speaking as a member of the A.T.I. Environmental Health Committee," denounced Selikoff as a "dangerous man," and questions were raised as to how to control him. Goodman's reported opinion was that Selikoff dealt in "half truths," and should be faced with the "true facts." Plaintiffs' Appendix at EEEE–8.

 While this Court is well aware that any and all of the evidence noted above is capable of a non-conspiratorial interpretation, the question before the Court is whether on a summary judgment motion there is any evidence from which a reasonable jury could infer that Southern was involved in a conspiracy with J–M, Raybestos, and other members of ATI to suppress information concerning the dangers of asbestos. Proof of conspiracy is often only by circumstantial evidence. *James Julian, Inc. v. Raytheon Company,* D.Del., 557 F.Supp. 1058, 1065 (1983). Taking all of the above evidence into account, and making all reasonable inferences in favor of the plaintiffs, I am satisfied that there is some evidence from which a reasonable jury could find such a conspiracy. Accordingly, summary judgment will be denied as to conspiracy.

Having stated the above, summary judgment is HEREBY GRANTED on product nexus as to plaintiff George Ward, but in all other respects is HEREBY DENIED.

IT IS SO ORDERED.