# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AUDITBOT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. N19C-08-199 MMJ CCLD |
| | ) |
| SELVAKUMAR MARIYAPPAN and | ) |
| CALSOFT LLC d/b/a EXPRESSGRC, | ) |
| | ) |
| Defendants. | ) |

Submitted: June 14, 2023
Decided: August 15, 2023

On Defendants' Motion for Summary Judgment
and to Dismiss Pursuant to Rules 12(b)(1) and (2)
**GRANTED**

On Plaintiff's Motion for
Partial Summary Judgment
**DENIED**


## OPINION

Anthony N. Delcollo, Esq., Thomas H. Kramer, Esq. (Argued), Offit Kurman, P.A., Wilmington, DE, *Attorney for Plaintiff*

Daniel F. McAllister, Esq., McAllister Firm LLC, Wilmington, DE, *Attorney for Defendants*

**JOHNSTON, J.**

## FACTUAL AND PROCEDURAL CONTEXT

This is a breach of warranty case. AuditBOT, Inc. ("AuditBOT") is a technology company that was created on February 10, 2012, by Vel Jayapaul ("Jayapaul") and Selvakumar Mariyappan ("Mariyappan"). AuditBOT was established to develop and market Advanced Business Application Programming ("ABAP")-based solutions for Systems, Applications, and Products in Data Processing ("SAP") business customers. These solutions enable businesses to store, organize, and process data using SAP licensed software. AuditBOT developed three ABAP-based software systems: (1) a Segregation of Duties ("SOD") risk solution that is part of the Governance, Risk, and Compliance ("GRC") framework for SAP systems; (2) an SAP license optimization and saver solution; and (3) a process controls solution for SAP systems and customers.

Initially, Jayapaul and Mariyappan agreed to equal ownership of AuditBOT but later settled on a change to the ownership structure. Jayapaul had primary responsibility for the development of the SAP solutions software and held seventy-five percent of the shares. Mariyappan was Chief Executive Officer with primary responsibility for day-to-day operations and held twenty-five percent of the shares. Mariyappan's other responsibilities included sales and marketing, promotion, facilitating product demonstrations, and engaging with current and prospective AuditBOT customers. He maintained a substantial amount of social media

contacts to whom he marketed AuditBOT solutions. During his time working for AuditBOT, Mariyappan maintained communication with several third parties regarding SAP solutions as part of his role as salesperson.

At the time of AuditBOT's creation, Mariyappan was also principal owner and operator of Calsoft LLC d/b/a ExpressGRC ("Calsoft"), an SAP consulting business that he started in 2001. Through Calsoft, Mariyappan functioned as a consultant and sub-contractor to companies that held contracts with the federal government. In this role, he conducted cyber security and internal audits of the government's use of those companies' SAP products. Mariyappan maintained and operated this business simultaneously while working for AuditBOT.

AuditBOT failed to attract many customers. Although the company made one large sale early on, by 2017 the company had only five customers. Around May 2017, Jayapaul received an unsolicited marketing email for another SAP solution called Remedyne. The email included a video and/or audio recording of Mariyappan promoting the product. This email and AuditBOT's poor sales caused Jayapaul to become concerned about Mariyappan's attentiveness to his work with AuditBOT. Subsequently, AuditBOT and Mariyappan executed a Settlement and Release Agreement ("Agreement") on November 10, 2017.

Section 2(c) of the Agreement contained broad releases and covenants not to sue. Section 2(c) of the Agreement states that AuditBOT and Mariyappan warranted to one another that

> factual matters now unknown to either party may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and the undersigned further agree, represent and warrant that the release provided hereunder has been negotiated and agreed upon in light of that realization.

Mariyappan also warranted that he had not provided any party with an unlicensed right to change, reengineer, or otherwise use any AuditBOT intellectual property and that he had not provided any form of ownership of AuditBOT intellectual property to any third parties. Further, Mariyappan warranted not to compete with AuditBOT in the production of SAP products, including Remedyne, for a period of five years. The Agreement transferred all of Mariyappan's shares to Jayapaul, who remains principal owner of AuditBOT.

Following the November 2017 execution of the Agreement, Jayapaul began searching through AuditBOT emails that predated the Agreement. Jayapaul suspected that Mariyappan had provided AuditBOT documents to third parties to develop solutions for Calsoft.

On August 21, 2019, AuditBOT filed suit against Mariyappan and Calsoft in the Complex Commercial Litigation Division of this Court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[1]  All facts are viewed in a light most favorable to the non-moving party.[2]  Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[3]  When the facts permit a reasonable person to draw only one inference, the question becomes one for decision as a matter of law.[4]  If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[5]

## ANALYSIS

AuditBOT alleges Mariyappan breached the Agreement by:  providing third parties the right to use AuditBOT intellectual property (Count I); providing third parties ownership of AuditBOT intellectual property (Count II); providing current and former AuditBOT customers with similar services (Count III); working and engaging with AuditBOT competitors (Count IV); and promoting a competitor's

---

[1] Super. Ct. Civ. R. 56(c).
[2] *Burkhart v. Davies*, 602 A.2d 56, 58-59 (Del. 1991).
[3] Super. Ct. Civ. R. 56(c).
[4] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967).
[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

solution similar to Auditbot's (Count V).[6] AuditBOT also alleges that: Calsoft committed Tortious Interference With Contractual Relations (Count VI); both Mariyappan and Calsoft committed Misappropriation of Trade Secrets (Count VII); both Mariyappan and Calsoft committed Deceptive Trade Practices (Count VIII); Mariyappan committed Fraud (Count IX); and Mariyappan committed Tortious Interference With Business Relations (Count X).[7]

Under Section 1 of the Agreement, Mariyappan warranted that:

> [H]e ha[d] not, directly or indirectly, provided any party with *any right other than a license to use* any intellectual property used by AuditBot in accordance with AuditBot's standard licensing terms and *has not provided any party with any right* to modify, derive, sublicense, make changes or enhancements, reuse, re-engineer, decompile or otherwise use any such intellectual property in its current or any derived form. [Mariyappan] has not, directly or indirectly, provided *any form of ownership of any intellectual property used by AuditBot to any other party*.[8]

Under Section 2(b) of the Agreement, Mariyappan warranted that:

> The Company on behalf of itself and its affiliates, officers, members, managers, heirs, representatives, legatees, successors and assigns, and each of them, hereby fully and forever release, discharge and acquit [Mariyappan], and [Calsoft], and each of them, from and against any and all claims, demands, obligations, duties, liabilities, damages, expenses, indebtedness, debts, breaches of contract, duty or relationship, acts, omissions, misfeasance, malfeasance, causes of action, sums of money, accounts, compensation,

---

[6] Def.'s Opening Br. in Supp. Mot. for Summ. J. and to Dismiss 1–2 (April 28, 2023).
[7] *Id.* at 2.
[8] *Id.* (emphasis added).

6

contract, controversies, promises, damages, costs, losses and remedies therefor, chooses in action, *rights* of indemnity or liability of any type, kind, nature, description or character whatsoever, and irrespective of how, why or by reason of what facts, whether known or unknown, whether heretofore now existing or hereafter arising, whether liquidated or unliquidated (collectively, "Rights"), that the Company ever had, may now have, or hereafter can, shall, or may have against [Mariyappan] arising in connection with, or in any way related to the Company, save and except for any Rights which may arise as a result of breach by [Mariyappan] of the terms and conditions hereof or with respect to any violation of any representation or warranty herein, including, but not limited to, Section 1. For the avoidance of doubt, the foregoing release shall not relate to any actions taken by [Mariyappan] after the date of this Agreement.[9]

### *Violation of Representation or Warranty*

AuditBOT argues that Mariyappan breached the Agreement by sharing AuditBOT proprietary software and information with third parties.[10] Mariyappan sent two email transmissions from his AuditBOT email address to third parties on May 21, 2013, and February 16, 2015. The May 21, 2013 email contained two documents: (1) a PDF entitled "SODAnalysis-Requirement.pdf"; and (2) a Word document entitled "GRC_DESIGN (2).docx"[11] The June 17, 2013 email contained

---

[9] *Id.* (emphasis added).
[10] Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. 13.
[11] *Id.* at 14.

an Excel spreadsheet entitled, "Rule_Set_Cloud.xlsx."[12] The emails did not include license or non-disclosure/confidentiality agreements.[13]

A similar action was filed in India. Jayapaul noted in his deposition that the India action involved the use of AuditBOT's software by ToggleNow ("ToggleNow"), Raghu Boddu ("Boddu"), and Clematis Technologies ("Clematis"). The allegations primarily centered on the use of AuditBOT's proprietary information *without* authorization or ownership and in violation of India's copyright laws.[14]

The Court finds that while there is evidence that Mariyappan transmitted AuditBOT documents to third parties as part of his job, there is no evidence in the record that he transferred any "right" or "any form of ownership" of AuditBOT software to those third parties. Additionally, AuditBOT's allegations in this case directly contradict the claims in the India lawsuit. Therefore, summary judgment is **GRANTED** in favor of Defendants and **DENIED** against Plaintiff on the breach of contract claims set forth in Counts I and II.

### *Release*

Section 2(b) of the Agreement is a broad, clear, and unambiguous release. For general releases such as Section 2(b), the intent of the parties as to the scope

---

[12] *Id.* at 15.
[13] *Id.* 14–15.
[14] Def.'s Ans Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. 4.

and effect of the release is controlling .[15] "[A]n effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released."[16] "[W]here the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it." [17] Here, Section 2(b) of the Agreement clearly and unambiguously warranted that AuditBOT "fully and forever release[d]" Mariyappan and Calsoft from any and all claims and covenanted not to sue.

AuditBOT argues that Mariyappan made statements to third parties while working for AuditBOT. Mariyappan allegedly represented to a third party that "we" have clients in Malaysia, Singapore, and Sri Lanka.[18] AuditBOT contends this is evidence of Mariyappan's breach of the warranties in the Agreement.[19] There is no evidence that Mariyappan continued to work for AuditBOT competitors after executing the Agreement on November 10, 2017.

---

[15] *Emerging Eur. Growth Fund, L.P. v. Figlus*, 2018 WL 6446467, at *4 (Del. Ch.) (citing *Corp. Prop. Assocs. 6 v. Hallwood Gp. Inc.*, 817 A.2d 777, 779 (Del. 2003) (citations omitted)).
[16] *Hicks v. Soroka*, 188 A.2d 133, 138 (Del. Super. 1963); *see also Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011).
[17] *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982) (internal citations removed).
[18] Dep. of Mariyappan (Ex. B to Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J.) at 67:9–68:4.
[19] Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. 16.

The Court finds that the evidence of Mariyappan's use of "we" in statements made to third parties while he worked for AuditBOT is at most speculation. Under Delaware law, "mere allegations . . . are not sufficient to avoid summary judgment. Rather, Court of Chancery Rule 56(e) states: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest on mere allegations . . . ."[20] "The Court 'will not indulge in speculation and conjecture; a motion for summary judgment is decided on the record presented and not on evidence potentially possible.'"[21]

Further, Mariyappan was a signatory to the Agreement and was released from all claims that existed prior to the time the Agreement was signed on November 10, 2017. Two narrow exceptions to this release allow AuditBOT to file a claim against Mariyappan. AuditBOT may file suit against Mariyappan and Calsoft: (1) with respect to "any Rights which may arise as a result of breach by [Mariyappan] of the terms and conditions [of the Agreement]"; or (2) "with respect to any violation of any representation or warranty [in the Agreement] . . . ."[22] These exceptions previously were discussed in connection with the breach of representations and warranties in Counts I and II.

---

[20] *Comet Sys., Inc. Shareholders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1032–33 (Del. Ch. 2008).
[21] *Brown v. City of Wilmington*, 2019 WL 141744, at *2 (Del. Super.) (quoting *In re Asbestos Litig.*, 509 A.2d 1116, 1118 (Del. Super. Ct. 1986), *aff'd sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987)).
[22] Agreement § 2(b).

Therefore, Counts III through X are covered by the broad release in Section 2(b) of the Agreement. Thus, summary judgment is **GRANTED** in favor of Defendants and **DENIED** against Plaintiff on Counts III through X.

### *Jurisdiction*

Mariyappan argues in his Motion to Dismiss that the Court does not have jurisdiction over AuditBOT's claims.[23] Pursuant to 10 *Del. C.* § 3104(c), there are six scenarios under which Delaware Courts may exercise personal jurisdiction over a non-resident defendant. These are where the non-resident:

> (1)    Transacts any business or performs any character of work or service in the State;
>
> (2)    Contracts to supply services or things in this State;
>
> (3)    Causes tortious injury in the State by an act or omission in this State;
>
> (4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;
>
> (5)    Has an interest in, uses or possesses real property in the State; or
>
> (6)    Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.[24]

---

[23] Def.'s Opening Br. in Supp. Mot. to Dismiss at 8 (April 28, 2023).
[24] 10 *Del. C.* § 3104.

The Agreement includes a forum selection clause naming Delaware as the jurisdictional choice of law. However, because the Complaint is dismissed in its entirety, the Court need not address subject matter jurisdiction or personal jurisdiction regarding Calsoft.

## CONCLUSION

The Court finds that while there is evidence that Mariyappan transmitted AuditBOT software information to third parties as part of his job, there is no evidence in the record that he transferred any "right" or "any form of ownership" of AuditBOT software to those third parties. Additionally, AuditBOT's allegations in this case directly contradict the claims in the India lawsuit. Therefore, summary judgment is **GRANTED** in favor of Defendants and **DENIED** against Plaintiff on the breach of contract claims set forth in Counts I and II.

The Court finds that the evidence of Mariyappan's use of "we" in statements made to third parties while he worked for AuditBOT is at most speculation. Further, Mariyappan was a signatory to the Agreement and was released from all claims that existed prior to the time the Agreement was signed on November 10, 2017. The two narrow exceptions to this release do not apply to Counts III through X, which are covered by the broad release. Therefore, summary judgment is **GRANTED** in favor of Defendants and **DENIED** against Plaintiff on Counts III through X.

12

The Agreement includes a forum selection clause naming Delaware as the jurisdictional choice of law. However, because the Complaint is dismissed in its entirety, the Court need not address subject matter jurisdiction or personal jurisdiction regarding Calsoft.

Therefore, Defendants' Motion for Summary Judgment and to Dismiss is hereby **GRANTED**. Plaintiff's Motion for Partial Summary Judgment is hereby **DENIED**.

**IT IS SO ORDERED.**

*/s/ Mary M. Johnston*

The Honorable Mary M. Johnston
