# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MARIANNE ROBINSON, individually : 
and as Personal Representative for the : 
Estate of JACK B. ROBINSON, : 
Deceased, : 
    : 
    : 
        Plaintiff, : 
    : 
    v. : 
    : 
UNION CARBIDE CORPORATION, : 
    : 
        Defendant. : 

C.A. No. N17C-06-143 (ASB)

## <u>OPINION</u>

Submitted:  May 29, 2019
Decided: August 15, 2019

Patrick J. Smith, Esquire, BALICK & BALICK, LLC., Wilmington, Delaware, *for the Plaintiff*.

Joseph S. Naylor, Esquire, SWARTZ CAMPBELL, LLC, Wilmington, Delaware, *for the Defendant*.

Clark, J.

Defendant Union Carbide Corporation ("UCC") moves for summary judgment against Plaintiff Marianne Robinson ("Ms. Robinson"). This suit involves UCC's sale of its bulk asbestos product, Calidria, to an intermediary, Georgia-Pacific. For many years, Georgia-Pacific included UCC's Calidria in joint compounds that it sold to consumers. Ms. Robinson alleges that her husband used these compounds. He was later diagnosed with lung cancer in July 2016, and has since passed away.

Here, Ms. Robinson sues UCC in her personal capacity and as Mr. Robinson's survivor. First, she sues UCC for its alleged failure to warn Mr. Robinson about Calidria's hazards. She also sues UCC pursuant to an Ohio statute that provides for strict liability for defectively designed or formulated products.

Based upon the facts of record, there are no genuine issues of material fact regarding Georgia-Pacific's status as a sophisticated intermediary. Nor are there genuine issues of material fact regarding the sufficiency of UCC's warnings to Georgia-Pacific, or UCC's reasonable reliance upon Georgia-Pacific to warn Mr. Robinson. Accordingly, UCC had no duty to warn Mr. Robinson about the dangers of UCC's bulk asbestos product.

With regard to her strict liability claim, raw products such as Calidria potentially fit within Ohio's definition of a product that can be defective in design or formulation. As a result, genuine issues of material fact remain regarding whether Ms. Robinson meets the Ohio statute's requirement that she prove that Calidria was defective in design or formulation. However, as to the proximate cause element of Ms. Robinson's strict liability claim, Ms. Robinson has not identified evidence of record supporting an inference regarding Mr. Robinson's likely exposure to Calidria. For these reasons and those that follow, UCC's motion for summary judgment must therefore be **GRANTED**.

2

## Facts of Record

The facts cited herein are those of record, viewed in the light most favorable to Ms. Robinson as the non-moving party. From 1963 to 1985, UCC mined and milled a unique short-fiber variety of asbestos called Calidria. It manufactured two different lines of Calidria; UCC designated the product line relevant to this case as SG-210. It sold SG-210 in pellet form to third-party manufacturers who then incorporated Calidria into consumer products. Those intermediaries in turn sold those products to consumer end-users.

When marketing Calidria, UCC advertised that:

> Calidria asbestos is produced by a proprietary manufacturing process that yields unusually high fiber content and more complete fiber liberation from the natural bundles. As a result, Calidria asbestos goes up to twice as far, pound for pound, as commercial grades of asbestos containing large amounts of other filler materials that have no specific desirable effect … .

Evidence of record supports a reasonable inference that UCC's milling process altered the raw asbestos from its original form. It also supports that UCC separately marketed its Calidria claiming that it contained only one-half the amount of asbestos as compared to typical bulk asbestos.

UCC sold this SG-210 line of Calidria to Georgia-Pacific. Relevant to this case, UCC distributed Calidria to Georgia-Pacific's Chicago facility from 1970 to 1977. Georgia-Pacific, in turn, included Calidria in some of the joint compounds it manufactured there. From its Chicago facility, Georgia-Pacific distributed these joint compounds to consumers in Ohio. Between 1971 and 1982, Mr. Robinson used Georgia-Pacific's joint compounds on at least ten occasions. Mr. Robinson purchased and used these Georgia-Pacific joint compounds in Ohio. He later died of lung cancer in late 2016 or early 2017.

3

Georgia-Pacific used asbestos in all of its Ready-Mix products from 1965 to 1977.[1]  Mr. Robinson used Ready-mix repeatedly during the time of his alleged exposure.  Included within the summary judgment record are formula cards for various Georgia-Pacific compounds.  One formula card demonstrates SG-210's inclusion in joint compounds that Georgia-Pacific manufactured at its Chicago facility.  Other formula cards in the record support that manufacturers other than UCC supplied asbestos for the Chicago manufactured compounds.

Prior to Mr. Robinson's alleged exposure, internal Georgia-Pacific documents demonstrate that its representatives attended Gypsum Association Safety Committee meetings as early as September 1966.   The Committee discussed the dangers of asbestos at those meetings.  In June 1970, Georgia-Pacific's Safety Supervisor sent a letter to the same Committee.  That 1970 letter referenced the need for someone to be the "whipping boy" to blame for asbestos dangers.  In that letter, Georgia-Pacific's safety officer suggested placing "the entire blame . . . on the contractor for not insisting on respirators and dust masks."   In addition, other internal Georgia-Pacific documents demonstrate that Georgia-Pacific had knowledge of asbestos related risks faced by their employees when they handled their own compounds.  Finally, and most tellingly, in November 1972, a Georgia-Pacific interdepartmental communication, "Joint Systems - Status Report," provided the following:

> [c]onsiderable concern has recently been expressed by various interests on the use of asbestos in joint systems.  It is therefore proper that you should be aware of what is being done to eliminate this raw material from our joint system product line.  After considerable work, what appears to be a suitable replacement for asbestos has now been found. . . . If this proves successful it is further hoped that some asbestos-free joint compound . . . will be available, on a very limited basis, within the first half of next year.[2]

---

[1] Ex. I, Pl.'s SJ Resp. at 78.
[2] Ex. H, Def.'s SJ Motion at 13.

In arguing there is a factual issue regarding Georgia-Pacific's sophistication, Ms. Robinson relies upon a single UCC call report. That report references a call between a Georgia-Pacific plant manager and a UCC representative in 1975 discussing what to advise contractors about sanding techniques to minimize exposure.[3] Specifically, the log references a UCC employee's advice to a Georgia-Pacific plant manager to tell contractors to wet sponge joint compounds to lessen airborne dust.

Affiant John Myers, an employee at UCC from 1951 to 1985, attested to his personal involvement in warning Georgia-Pacific about the dangers of asbestos. He spoke at a number of seminars about those dangers. Present at the seminars were UCC's Calidria customers and potential customers. Furthermore, in 1968, UCC began placing asbestos warnings on their bags of Calidria. By 1972, UCC changed the structure of its warnings to comply with then promulgated OSHA standards. At that point, on each bag of Calidria, UCC included the following:

CAUTION<br>
Contains Asbestos Fibers<br>
Avoid Creating Dust<br>
Breathing Dust May Cause<br>
Serious Bodily Harm

Furthermore, beginning in 1968, UCC began sending toxicology reports to Georgia-Pacific. Those reports specifically discussed the risk of asbestosis, lung cancer, and mesothelioma. UCC revised its reports, explaining those risks, in 1969, 1970, and 1972.

---

[3] Ex. L, Pl.'s SJ Resp.

## Standard

Summary judgment is appropriate only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[4] When deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.[5] The burden of proof is initially on the moving party to demonstrate that no genuine issues of material fact are present.[6] In this regard, a "moving defendant always has the burden of producing evidence of necessary certitude negating the plaintiff's claim."[7]

If the movant meets his or her initial burden, then the burden shifts to the non-moving party to demonstrate the existence of material issues of fact.[8] The non-movant's evidence of material facts must be sufficient to withstand a motion for judgment as a matter of law and sufficient to support the verdict of a reasonable jury.[9]

## No genuine material issues of fact remain regarding the applicability of the bulk supplier defense.

In the Court's view, duty is the threshold issue in any negligence claim. It therefore first examines whether UCC had the duty to warn Mr. Robinson about Calidria's dangers. Ohio substantive law applies to the case at hand. The parties agree that there is a bulk supplier defense under Ohio law, but dispute its elements. That defense permits a supplier of bulk products to discharge its duty to warn end-

---

[4] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979); *In re Asbestos Litigation*, 2007 WL 2410879, at *1 (Del. Super. Aug 27, 2007).
[5] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[6] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680.
[7] *Ebersole v. Lowengrub*, 180 A.2d 467, 469--470 (Del. 1962).
[8] *Id*. at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).
[9] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).

users about a product's hazards based upon the supplier's reasonable reliance upon an intermediary to do so.[10] Under this doctrine, "a manufacturer can discharge its duty to warn by providing the necessary information to an intermediary upon whom it can reasonably rely to communicate the information to the ultimate user of the product."[11]

UCC and Ms. Robinson argue contrary applications of Ohio's bulk supplier defense based upon the facts of record. If the defense ultimately applies, UCC had no duty to warn end-users such as Mr. Robinson regarding the dangers of Calidria. Absent application of the defense, UCC would have had the duty to reasonably warn Mr. Robinson about Calidria's dangers.

At the outset, Ms. Robinson argues that the traditional requirements for the defense apply. Namely, she argues UCC would have been relieved of its duty to warn Mr. Robinson only if Georgia-Pacific (1) was a sophisticated bulk purchaser, (2) if UCC gave Georgia-Pacific an adequate warning, and (3) UCC reasonably relied upon Georgia-Pacific to warn its customers. UCC counters that while there is no issue of material fact regarding the sufficiency of its warnings to Georgia-Pacific, Ohio law requires only two things. Namely, UCC argues that Georgia-Pacific must have only been adequately informed about the dangers of bulk asbestos and must have had the ability to warn the ultimate consumer.

In advocating the more limited elements of the defense under Ohio law, UCC relies primarily upon a federal case from the Northern District of Ohio, *Midwest Specialties v. Crown Indus. Products Co.*[12] Namely, the *Midwest* decision holds that "[a] manufacturer does not act unreasonably by failing to warn intermediate purchasers of dangers of which the intermediate purchasers are already

---

[10] *Midwest Specialties, Inc. v. Crown Indus. Products Co.*, 940 F.Supp. 1160, 1165 (N.D. Ohio 1996).
[11] *Id.*
[12] *Id.*

7

knowledgeable."[13]   In doing so, that court reasoned that warnings to a sophisticated intermediary would serve no purpose if the intermediary already appreciated the danger.[14]   According to that court, unless there is a genuine issue of material fact regarding the intermediary's failure to appreciate the danger, the bulk supplier had no duty to warn the end-user.  In such a case, a bulk supplier's reliance upon the intermediary was automatically reasonable.[15]

Ms. Robinson counters UCC's arguments regarding the limited elements of the doctrine by relying upon the Ohio appeals court decision, *Roberts v. George V. Hamilton, Inc*.[16]  She emphasizes that case's holding that requires the trier of fact to evaluate the reasonableness of the bulk supplier's reliance on the intermediary. Namely, she argues that (1) reasonable reliance is almost always a factual issue, and that (2) based on the summary judgment record, UCC did not meet its initial burden by demonstrating that UCC's reliance upon Georgia-Pacific was reasonable.  Here, the Court need not resolve the dispute regarding Ohio's elements for the defense. There are no genuine issues of material fact regarding the expanded elements that Ms. Robinson advocates.

With regard to the *Roberts* case, the plaintiff died from mesothelioma allegedly caused by defendant's asbestos-containing insulation.[17]  There, the court declined to grant summary judgment in favor of the defendant bulk supplier.  In doing so, it relied upon Comment n of the Restatement (Second) of Torts § 388 ("Section 388").[18]  From that Comment, the court required the trier of fact to weigh the following factors:

> the dangers associated with the product, the purpose of the product, the form of warning given if any, the reliability of the purchaser of a

---

[13] *Id.*

[14] *Id.* at 1165--1166.

[15] *Id.*

[16] 2000 WL 875324 (Ct. App. Ohio, Jun. 30, 2000).

[17] *Roberts*, 2000 WL 875324 at *1.

[18] *Id*. at *4.

8

conduit, the magnitude of the risk, and the burden imposed on the supplier if it must warn all of the users.[19]

Under the facts of that case, the Ohio appeals court found that the facts of record precluded summary judgment.[20]

*Roberts,* however, is distinguishable from the present case. When examining the issue of whether the bulk supplier reasonably relied upon the intermediary, the evidence of record in *Roberts* included evidence that (1) there was no warning on the asbestos insulation's packaging, and (2) it did "not appear to be disputed that the actual users were unaware of the danger of asbestos exposure."[21] The *Roberts* decision also included the court's application of the doctrine in a case where the end-users were the intermediary's employees.

In the case at hand, the record demonstrates numerous instances where UCC warned Georgia-Pacific with toxicology reports, brochures, and prominent warnings on UCC's bags. The *Roberts* decision referenced no such warnings. Furthermore, in this case, Georgia-Pacific included Calidria as a mere component in joint compounds that it sold to end-users. There was no means for UCC to warn an end-user, such as Mr. Robinson, about asbestos. This is in direct contrast to the situation presented in the *Roberts* decision where the plaintiff was an employee of the intermediary that had purchased the insulation. When examining Comment n's factors against the evidence of record in this case, no reasonable jury could find that UCC unreasonably relied upon Georgia-Pacific to warn end-users.

Other decisions applying Ohio law have applied the bulk supplier defense at the summary judgment stage. These decisions applied Comment n to Section 388 and entered summary judgment nevertheless. For instance, the Sixth Circuit Court

---

[19] *Id.*

[20] *Id.* at *5.

[21] *Id.* at *4.

of Appeals granted summary judgment in the *Adams v. Union Carbide Corporation*[22] case. There, a former GMC employee sued UCC for failure to adequately warn him of the dangers of one of UCC's chemicals. UCC sold the chemical to GMC for use in motor vehicle assemblies. In applying the reasonable reliance standard as outlined in Comment n to Section 388, that court held UCC's duty as the supplier to be discharged as a matter of law. That court found that UCC reasonably relied upon GMC to convey the information to the ultimate users, GMC's employees.[23] In doing so, the court held that:

> [the] fact that GMC repeatedly updated its information about [the chemical] from Union Carbide, coupled with the fact that GMC itself had a duty to its employees to provide them with a safe place to work, supports the inescapable conclusion that it was reasonable for Union Carbide to rely upon GMC to convey the information about the hazardous propensities of [the chemical] to its employees within the context of [C]omment n of the restatement.[24]

Similarly, in *Ditto v Monsanto*,[25] when applying Ohio law, the federal Northern District of Ohio examined a case of leukemia allegedly caused by exposure to Monsanto's chemicals placed by intermediaries into transformers. There, Monsanto moved for summary judgment raising the bulk supplier defense.[26] Echoing the holding in *Adams*, the district court found that Monsanto had no duty under Ohio law to warn the plaintiff directly where Monsanto supplied chemicals to electrical equipment manufacturers who in turn sold the equipment to consumers.[27] As in the case at hand, that court held on summary judgment that Monsanto had no ability to place a warning on the product, no way to identify who purchased the

---

[22] 737 F.2d 1453 (6th Cir. 1984).
[23] *Id.* at 1457.
[24] *Id.*
[25] 867 F.Supp 585 (N.D. Ohio 1993).
[26] *Id.* at 591.
[27] *Id.* at 593.

electrical equipment containing the product, and no way to know who worked with the product.[28]

Here, the evidence of record demonstrates that there is no issue of material fact regarding Georgia-Pacific's status as a sophisticated intermediary. By the mid-1960s, Georgia-Pacific was a large, publicly-traded company and one of the leading manufacturers of drywall and joint-compound products. Georgia-Pacific knew of the dangers of asbestos in the mid-1960s. By June 1970, it observed the close connection between lung-disease and its own asbestos workers. Later in June 1970, it even suggested blaming the contractors as the responsible parties because the contractors were not requiring their employees to use respirators and dust masks. Continuing into the early 1970s, Georgia-Pacific issued mandatory respiratory requirements for its employees that handled asbestos. In 1972, Georgia-Pacific issued a memorandum stating that it was phasing out all asbestos in its compounds. No reasonable jury could conclude based on the evidence of record that Georgia-Pacific failed to appreciate Calidria's dangers.

Of the evidence of record, balanced against this is only a call log referencing a 1975 call between *a* UCC employee and *a* plant manager of an unidentified Georgia-Pacific plant. Such evidence does not generate a triable issue of fact regarding Georgia-Pacific's knowledge of the dangers of asbestos or regarding UCC's reliance on Georgia-Pacific. Rather, it merely evidences a discussion with a plant manager at a Georgia-Pacific plant about wet sponging the compound to reduce dust. Given UCC's employees' participation in providing warnings and data to Georgia-Pacific for years prior to this single call, the call log raises no genuine issue of material fact regarding UCC's reliance upon Georgia-Pacific to reasonably warn Mr. Robinson. Looming large in the Court's summary judgment analysis is the undisputed reality that UCC had no ability to warn the end-users in this case.

---

[28] *Id.*

Finally, apart from Georgia-Pacific's sophistication and UCC's reasonable reliance, there is no genuine dispute of material fact regarding the adequacy of UCC's warnings to Georgia-Pacific. Each bag of Calidria contained a warning printed on its exterior. In support of its motion, UCC provided an employee's affidavit who attested that he directly warned Georgia-Pacific about Calidria's dangers. UCC also regularly sent MSDS sheets and toxicology reports to Georgia-Pacific that addressed Calidria's dangers. Ms. Robinson proffers no evidence regarding the inadequacies of these warnings.

In summary, when considering the evidence of record with the appropriate deference, no reasonable jury could find for Ms. Robinson on this issue. Namely, no jury could reasonably find other than that Georgia-Pacific was (1) fully knowledgeable about the dangers of asbestos and was thus sophisticated, (2) UCC gave Georgia-Pacific adequate warnings regarding the dangers of Calidria, and (3) UCC reasonably relied upon Georgia-Pacific to warn Mr. Robinson. Accordingly, summary judgment regarding Ms. Robinson's duty to warn claim must be **GRANTED.**

## Material issues of fact remain regarding whether the sale of Calidria falls within Ohio's definition of a strict liability claim.

In a footnote to UCC's motion for summary judgment, UCC argued that Ms. Robinson is unable to sustain a defective design claim against them, because as provided in The Restatement (Third) of Torts, a raw material cannot be defectively designed.[29] Ms. Robinson did not address UCC's argument in her written response;

---

[29] *See* Restatement (Third) of Torts: Product Liability § 5, cmt. c (1998) (providing that "[r]egarding the seller's exposure to liability for defective design, a basic raw material such as sand, gravel, or kerosene cannot be defectively designed. Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use. The manufacturer of the integrated product has a significant comparative advantage regarding selection of materials to be used. Accordingly, raw-

12

in fairness, when UCC sought summary judgment regarding one of Ms. Robinson's two claims, it should not have raised it in a footnote.

At oral argument, Ms. Robinson requested the opportunity to respond. The Court permitted supplemental briefing regarding Ms. Robinson's strict liability claim. In this decision, the Court has considered the supplemental arguments and the evidence of record cited by the parties. Again, all referenced facts are those viewed in the light most favorable to Ms. Robinson.

Both parties agree Ohio statutes control Ohio strict liability claims. In this regard, Ohio's Product Liability Claims Act (hereinafter "the Act") "abrogate[s] all common law product liability claims and causes of action."[30] The Act first outlines product liability claims in general. It then includes specific sections providing for strict liability in certain circumstances.[31]

The first element of a strict liability claim under Ohio law requires a finder of fact to determine whether a product is defective in design or formulation. UCC argues that Calidria is raw asbestos and therefore cannot be defectively designed. UCC also emphasizes three prior Superior Court decisions where the Superior Court held that Calidria could not be designed because it is a bulk product. Third, UCC emphasizes two provisions in the Act that it alleges removes a bulk product such as Calidria from the provisions of Ohio's strict liability statute.

Ms. Robinson counters that a factual issue remains regarding whether asbestos fits within the Ohio statutory definition of a product that is "defective in design or formulation." She also emphasizes Ohio case law that recognizes the highly factual nature of this issue.

---

materials sellers are not subject to liability for harm caused by defective design of the end-product. The same considerations apply to failure-to-warn claims against sellers of raw materials").

[30] ORC § 2307.71 (B).

[31] *See* ORC § 2307.75. Throughout this decision, the Court will alternatively refer to the instant claim both as a "defective design or formulation" claim and as one based upon strict liability.

13

Since both parties agree that Ohio statutory law controls this issue, the Court first turns to the Act's definitions and provisions. The prior Superior Court decisions referenced by UCC do not reference or apply this Act's provisions. Accordingly, the Court does not rely upon them. Rather, it addresses Ohio's statutory requirements for this claim.

The threshold inquiry in the analysis is whether UCC's sale of Calidria could be the subject of a "product liability claim." At the outset, the definition of "product" in the Ohio statute expressly includes "raw material."[32] Furthermore, a "product liability claim" includes, *inter alia*, a claim arising from the "formulation production . . . or marketing" of such a product.[33] Here, Ms. Robinson, as the non-movant, is entitled to an inference based on the evidence of record that UCC's processes included the formulation, production, *or* marketing of Calidria.[34]

Furthermore, the Act defines "manufacturer" broadly to include any "person engaged in a business to . . . produce . . . a product."[35] There is no dispute on the record that UCC fits within that definition. Given these general product liability provisions and definitions, the Court next turns to the more specific provisions applicable to Ohio's strict liability claims. In short, a manufacturer is subject to strict liability if:

(1) [t]he manufacturer's product . . . was defective in manufacture or construction [or] in design or formulation;
(2) [a] defective aspect of the manufacturer's product . . . was a proximate cause of harm . . .; [and]
(3) [t]he manufacturer designed [or] formulated the actual product that was the cause of harm . . . .[36]

---

[32] ORC § 2307.71 (A)(12)(a).
[33] ORC § 2307.71 (A)(13)(a).
[34] *See* ORC § 2307.71 (A)(13)(a) (providing further limitations to the definition of a "product" for purposes of a "product liability claim").
[35] ORC § 2307.71 (9).
[36] ORC § 2307.73 (A).

14

After providing for this type of claim, the Act then includes a separate section that addresses specific aspects of Ohio strict liability. Namely, Section 2307.75(A) sets limits regarding what type of products fall within strict liability claims. Section 2307.75 (A) provides that:

> *[s]ubject to* divisions (D), (E), and (F) of this section, a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section.[37]

UCC focuses primarily on the term "design" in its argument. Even if the Court were to accept UCC's argument that Calidria, as a matter of law, is not designed, Section 2307.75 (A) further provides that if Calidria qualifies as a "formulation," marketing Calidria is actionable. Alone, UCC's marketing materials advertising Calidria, if accepted by the trier of fact, establish that Calidria, as altered asbestos, constitutes a formulation. Evidence of record further supports that UCC marketed its product as part of a "proprietary manufacturing process that yields unusually high fiber content and more complete fiber liberation from the natural bundles." Moreover, apart from the factual issue regarding whether Calidria is a "formulation," an admission from UCC to this effect, separately generates a triable issue of fact regarding whether Calidria is "designed."

UCC also argues that two separate divisions in this section preclude Ms. Robinson's strict liability claim. Namely, Section 2307.75(A) provides that defective design and formulation claims are "subject to divisions … (E) and (F)" of that section.[38]

First, division (E) of Section 2307.75 provides that:

---

[37] ORC § 2307.75(A) (emphasis added).
[38] ORC § 2307.75(A).

15

[a] product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability **and** which is recognized by the ordinary person with the ordinary knowledge common to the community.[39]

UCC argues that Calidria is exempt from a claim for strict liability under Ohio law because the "inherent characteristic of the product" cannot be altered without compromising the product's usefulness. This argument ignores the second requirement in that division. Namely, the division also requires, before exempting a product, that "an ordinary person with ordinary knowledge common to the community" must recognize the danger of the product. UCC identifies no facts of record supporting that an ordinary consumer, such as Mr. Robinson, possessed adequate knowledge regarding Calidria's dangers.

Second, division (F) of the Section 2307.75 next provides that:

[a] product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm … without substantially impairing the usefulness or intended purpose of the product.[40]

Here, UCC identifies no evidence of record supporting what is in essence an affirmative defense. Furthermore, the applicability of this division is called into question by UCC's own advertisements. These include admissions that it produced Calidria pursuant to a "proprietary manufacturing process." Where UCC advertised that it employed a proprietary process in producing Calidria, a trier of fact can permissibly infer that UCC considered alternatives to that process. Accordingly, a

---

[39] ORC § 2307.75(E) (emphasis added).
[40] ORC § 2307.75(F) (emphasis added).

factual dispute remains regarding whether division (F) to Section 2307.75 exempts UCC from ultimate liability.

Apart from rote statutory analysis, Ohio state case law also strongly supports denying summary judgment on this issue. Here, Ms. Robinson correctly cites Ohio authority providing for two relevant avenues for a plaintiff to establish strict liability in cases such as this. Most helpful is an Ohio Supreme Court decision. Namely, in *Perkins v. Wilkinson Sword, Inc.,*[41] the Ohio Supreme Court recognized when applying the provisions discussed above that:

> a product is defective in design or formulation if *either* of the following applies:
> (1) [w]hen it left control of its manufacturer, the foreseeable risks associated with its design or formulation . . . exceeded the benefits associated with the design or formulation . . ; [or]
> (2) [i]t is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

In the *Perkins* decision, the Ohio Supreme Court answered a certified question from the United States Court of Appeals for the Sixth Circuit.[42] When doing so, it rejected prior authority that the risk/utility test portion of subdivision (E) to Section 2307.75 applies "only when . . . the product could be made safer through an alternative design and not when the product is by itself dangerous."[43] Furthermore, the Ohio Supreme Court rejected the argument that division (E)'s risk/utility test does not apply when a dangerous product is functioning properly.[44] When applying the *Perkins* decision's reasoning to the facts of this case, UCC has not met its initial burden on summary judgment to negate Ms. Robinson's claim under either the

---

[41] 700 N.E.2d 1247, 1249 (Ohio 1998).
[42] *Id.* at 1247.
[43] *Id.* at 1249.
[44] *Id*. at 1249-1250.

17

risk/utility test provided in division (F), or the appreciable danger tests provided in division (E).

**Notwithstanding that Calidria may be defective in design or formulation, Ms. Robinson has not demonstrated a genuine issue of material fact regarding product identification.**

The disposition of this portion of UCC's motion turns on the second element of an Ohio strict liability claim. Namely, an Ohio defective design and formulation claim requires a plaintiff to demonstrate proximate cause.[45] As a prerequisite to proving proximate cause in any product liability case, a plaintiff must prove more likely than not that it was the defendant's product that caused the harm.[46] If there is not at least a probability of exposure to a defendant's product, that product could not have proximately caused a plaintiff's injury.

The evidence of record regarding product identification is mixed. Both parties emphasize formula cards referencing SG-210 as a component in various Georgia-Pacific compounds. In this regard, UCC has met its initial burden on summary judgment by identifying formula cards for Georgia-Pacific's relevant products that do not include Calidria. UCC also identifies evidence of record supporting that UCC was a minor supplier of asbestos during the times of Mr. Robinson's use of the products.

On the other hand, Ms. Robinson references one formula card that supports that Georgia-Pacific included Calidria in joint compounds that it manufactured in Chicago. Ms. Robinson also provides a number of formula cards that reference

---

[45] ORC § 2307.73.

[46] *Fogle v. Cessna*, 1992 WL 10272, at *4 (Ohio Ct. App. Jan. 16, 1992). *See also Richards v. Copes-Vulcan, Inc.*, 2019 WL 3282056, at *4 (Del. Jul. 22, 2019) (discussing ORC § 2307.96 and Ohio's statutory requirement of substantial factor analysis regarding proximate cause). The Court need not address the substantial factor test because there is no issue of fact regarding Mr. Robinson's probable exposure to Calidria.

18

Calidria in the recipe used at Georgia-Pacific's Akron, New York plant. Ms. Robinson argues that (1) these formula cards, (2) an admission in UCC's briefing that after 1974, Georgia-Pacific increased its usage of Calidria, and (3) that all Georgia-Pacific's joint compounds during that period contained asbestos, permit a reasonable inference of Mr. Robinson's exposure to Calidria.

The burden of proof at trial is on the plaintiff to establish proximate cause by a preponderance of the evidence. At this stage of the proceedings, because UCC has met its initial burden on summary judgment, Ms. Robinson must demonstrate facts of record that would permit a reasonable jury to infer product identification by a preponderance of the evidence. While proximate cause is generally an issue of fact,[47] a jury cannot be left to speculate regarding whether Mr. Robinson was exposed to a UCC product.[48] Both counsels' arguments referencing formula cards, their meanings, and the extent to which they may or may not cover the universe of products manufactured at the Chicago plant, are merely argument. Such argument does not independently justify or defeat a required inference, absent evidence of record.

At the outset, the Court acknowledges that some prior Superior Court cases have seemingly altered the burden of proof regarding product identification. Namely, some of these decisions, oral and written, have applied a blanket rule requiring summary judgment if two or more bulk suppliers supplied asbestos to an intermediary, absent direct evidence of a plaintiff's exposure. Some other decisions have properly applied traditional tort law concepts, but due to their brevity, have been repeatedly cited as providing for non-traditional tort law principles.

For instance, in *Sturgill v. 3M Company*,[49] this Court granted summary judgment in favor of Union Carbide when finding that the plaintiff in that case could

---

[47] *Fogle*, 1992 WL 10272, at *4.
[48] *Id.*
[49] 2017 WL 6343519, at *1 (Del. Super. Dec. 11, 2017).

show no more than that UCC was one of multiple suppliers of asbestos to the intermediary.[50]   Likewise, in *Aveni v. UCC*,[51] the Superior Court granted summary judgment by finding that while the evidence of record demonstrated that UCC supplied Calidria to the intermediary joint compound manufacturer, UCC was not the intermediary's sole supplier.[52]  As a result, with no further analysis, the Court  in *Aveni* held that it would require "pure speculation, that the product [used by the plaintiff] contained asbestos and the asbestos was provided by Union Carbide."[53] Most recently, in *Rowland v. American Biltrite, Inc.,*[54] the Superior Court granted summary judgment based on product identification.  There, UCC, Georgia-Pacific, and Ohio law were all involved.  While the Plaintiff in that case did not contest summary judgment regarding defective design or formulation, many of the same formula cards and arguments raised in that case were at issue in this case.

These written decisions and a significant number of Superior Court oral summary judgment decisions echo a principle set forth in *Nutt v. A.C. & S. Co., Inc.*, [55] which causes some of the confusion.   No Delaware Supreme Court decision, to this Court's knowledge, has approved applying *Nutt*'s reasoning rejecting market share liability in the way UCC requests and in the manner that many Superior Court decisions have applied it.  In this Court's view, *Nutt's* holding rejecting market-share liability has improperly bled into what should be a traditional proximate cause analysis.

In *Nutt*, the Superior Court correctly held that absent legislation adopted by the General Assembly, Delaware law does not provide for alternative liability such

---

[50] *Id.* at *3.
[51] 2017 WL 5594055, at *1 (Del. Super. Nov. 8, 2017).
[52] *Id.*
[53] *Id.* at *2.
[54] 2019 WL 1787451, at *1 (Del. Super. Apr. 24, 2019).
[55] 517 A.2d 690 (Del. Super. 1986).

as market-share liability.[56]   Ohio has also not adopted market-share liability as a means for bypassing traditional proximate cause requirements.[57]   In *Nutt*, the Superior Court granted summary judgment based on product nexus because (1) *no* records existed showing shipments of the defendant's asbestos to the relevant plant, and (2) there were other suppliers.[58]   The plaintiff in that case sought to apply market-share liability.   At the outset, that situation is distinguishable from the case at hand.   Here, there is evidence of record demonstrating that UCC shipped Calidria to the Chicago plant for use in Georgia-Pacific's products that it sold in Ohio.

Market-share liability is a concept wherein a plaintiff seeks to impose collective liability on a product's manufacturer in the absence of any evidence identifying the manufacturer of the product causing the harm.   This constitutes alternative liability because the identity of the manufacturer cannot be determined and the plaintiff is "unable to identify any of the specific manufacturers responsible for the harm."[59]   Absent any evidence of product identification, that concept permits a finding of exposure based upon only upon an asbestos supplier's overall share of the market.

In some Superior Court cases decided since *Nutt*, the Superior Court has imposed an impossible and inappropriate burden on the plaintiff.   These cases require a plaintiff to provide evidence justifying an inference of certainty of exposure when two or more suppliers provided asbestos to the intermediary.   Such a blanket requirement does not flow from traditional concepts of tort law.   Furthermore, such an approach ignores that the standard of proof is to a preponderance of the evidence

---

[56] *Id.* at 694.

[57] *See Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 188 (Ohio 1998) (holding that "[i]n Ohio, market-share liability is not an available theory of recovery in a products liability action").

[58] *Nutt,* 517 A.2d at 693.

[59] Richard E. Kaye, *"Concert of Activity," "Alternate Liability," "Enterprise Liability," or Similar Theory as Basis for Imposing Liability Upon One or More Manufacturers of Defective Uniform Product, in Absence of Identification of Manufacturer of Precise Unit or Batch Causing Injury,* 63 A.L.R.5th 195, § 2[b] (1998).

and that a plaintiff may meet his or her burden of proof by circumstantial evidence alone. In fact, circumstantial evidence may establish the entire basis for recovery when a plaintiff is unable to specifically identify the manufacturers' asbestos products as the one to which he or she was directly exposed.[60] Direct, circumstantial, or statistical evidence suffices to generate an issue of material fact regarding product identification if the evidence provides at least a reasonable inference of a greater than fifty-percent chance of exposure to the defendant's product.

Here, the Court recognizes the appropriate deference due to Ms. Robinson regarding the issue of proximate cause. Nevertheless, she has not identified sufficient evidence of record that would justify any reasonable jury in finding for her on the issue of product identification. Formula cards, without context, where some cards list Calidria as an ingredient and some do not, together with an admission by UCC that it increased shipments of Calidria to Georgia-Pacific during the relevant period, do not alone meet Ms. Robinson's duty on summary judgment to demonstrate a genuine issue of material fact. Adding in the sole additionally cited fact recognizing that Georgia-Pacific may have included asbestos in all of its joint compounds during the relevant time does not alter that reality. She identifies no further circumstantial evidence, statistical evidence, systems engineering expert opinion, or other evidence of record from a Georgia-Pacific representative in support of proving Mr. Robinson's exposure to Calidria.

On balance, there is no question that evidence of record supports an inference that there was a *possibility* of exposure to UCC's asbestos. However, Ms. Robinson has not stepped forward with evidence supporting a reasonable inference that there was *a probability* of exposure to UCC's asbestos at any period of time relevant to this claim. Under these facts of record, the trier of fact would be forced to speculate regarding this material issue of fact. That decision cannot be left to speculation.

---

[60] Am. L. Prod. Liab. 3d § 122.35 (2019).

## Conclusion

For the foregoing reasons, Defendant Union Carbide Corporation's motion for summary judgment must be **GRANTED**.

<u>/s/Jeffrey J Clark</u>
Judge